**UNITED STATES of America, Petitioner-Plaintiff,**

v.

**7.14 ACRES OF LAND, MORE OR LESS, IN the TOWN OF EAST HAMPTON, COUNTY OF SUFFOLK, STATE OF NEW YORK, and Montauk Beach Company, Inc., et al., Defendants.**

No. C.P. 111.

United States District Court
E. D. New York.

Oct. 6, 1961.

---

Harry T. Dolan, Sp. Asst. to Atty. Gen. of U. S., Brooklyn, N. Y., for petitioner-plaintiff.

Goldstein, Judd & Gurfein, New York City, for claimant-respondent, by Orrin G. Judd and Edward A. Bernstein, New York City, of counsel.

BYERS, District Judge.

This condemnation proceeding was initiated on August 17, 1959 by a declaration of taking, and involves 6.65 acres as to which fee title is involved and .49 acres in two five foot strips on either side of a road, as to which easements were acquired.

### Location

The property lies at the eastern end of Long Island and is about 125 miles from New York City. It is not less than two miles West of Montauk light; comprises part of some 1,100 acres lying East of Lake Montauk; it is bounded on the North by Block Island Sound, and on the South by the Atlantic Ocean, these waters being separated by about two and one-half miles of land, in which these properties lie.

It is possible that the said 1,100 acres do not embrace lands bordering on the ocean, although all the property above referred to is owned by Montauk Beach Company, Inc., the defendant; it is agreed that the subject matter of the proceeding is part of acreage extending Easterly from Lake Montauk embracing about 1,100 acres.

The character of the terrain is fairly level, with many knolls to relieve a flat appearance; there are practically no trees, and the general aspect is that of Scottish Moors, carpeted by low bushes and grass into which in recent years cattle were turned for forage.

The natural advantages are the wealth of marine views, and a certain remoteness from many modern innovations that are less than priceless when imposed upon a tranquil and attractive manifestation of Nature's unaided handiwork.

It will be seen that this cause, like most others in the same category, presents its own peculiar problems.

### The Purpose of the Taking

The U. S. Army Corps of Engineers initiated the proceeding in order to install what is known as a G.A.T.R. (Ground, Air, Transmission, Receiving) station for the U. S. Air Force. This means a series or set of radio installations for communication with defensive air borne weapons, manned or unmanned.

There is a one-story building 113 feet long, 26 feet wide of concrete block, which varies in height from 14½ to 15½ feet. Adjacent to this is a concrete and masonry building 50 x 29 which houses the power plant.

These buildings are enclosed in a security fence, which also surrounds the installation as described in U.S. Exhibit 3:

"It is contemplated that eleven power antennae will be constructed, each mounted on an individual wooden telephone pole. These poles, variable in height, will be probably in excess of 60 feet and more likely 80 feet above ground level. In addition thereto, plans provide for four high power antennae, two of which will be mounted between two 90 foot poles. The remaining two high power antennae will be of steel construction 60 feet in height and 50 feet in radius, each side giving the appearance of the letter 'D' from an aerial view. The straight side of the 'D' will face toward the building."

The following exhibits must be examined in order to gain an understanding of the project itself, the property involved and the surrounding terrain: U. S. Exhibits 1, 5, 12, 13, 14 and 15. The many photographic views included in the

exhibits for both sides accurately portray the terrain and the various structures involved.

That this installation is of the first importance to our nation is obvious, and is not the subject of discussion in any of the briefs. The subject is mentioned as a reminder that all close questions must be approached with some understanding that more searching inquiries are involved than those which would arise in purely civil litigation involving the respective rights of grantors and grantees in which nice distinctions might be appropriate in the effort to clear or establish real estate titles or interests, e. g., Gardner v. Forest Lake, etc., Sup., 131 N.Y.S.2d 363.

The occasion for that observation will become apparent in the discussion of the effect to be given to the Ringwood Map presently to be referred to.

The buildings erected by the Government are not in themselves the subject of criticism. They are of such a general aspect as might have been erected for occupancy as a residence and garage, had a private purchaser acquired the property by purchase from the defendant in ordinary course of dealing. The fact that no such purchase was made is consistent with the few acquisitions of residential property in this locality, during the period of ten years starting in 1951. In other words, these 1,100 acres have not been in demand for residential purposes during that period of time. The only two buildings of that type within the area lying East of East Lake Drive (which runs along the Easterly side of Lake Montauk) and extending for a distance of 4,000 feet, are the Star and Weismantel residences which are South of the property taken and not nearer thereto than 300 feet.

The other sales relied upon by the experts on both sides, were of unimproved acreage and will be alluded to on the subject of damages.

The 6.65 acres taken when viewed in plan, resemble a reversed letter "L" with is lower arm extending to the left (West) and the longer arm running nearly North and South; the greater length is thus of about 800 feet and the lesser nearly 600 feet. The width of the longer section is nearly 300 feet down to the lower arm and the base line of the figure is less than 500 feet. The Southerly line is connected with the Easterly one by a diagonal line of approximately 125 feet extending in a Northeasterly direction.

The area so embraced involves the level top of a knoll which is about 155 feet above sea-level; its height above the mean level of surrounding lands is not shown.

Since most matters are relative, this rise can be called a hill top, i. e., the top of a low hill in an area that contains no obviously higher knoll, but several of nearly the same altitude.

The award of damages will be seen to involve (a) the fair and reasonable market value of the 6.65 acres; (b) the indirect damage, if any, occasioned by the taking, being the amount by which surrounding property not taken may be deemed to have thereby suffered a loss in value, and (c) the value of the property subjected to the esements impressed or imposed upon the two five foot strips abutting upon the access roadway which leads from East Lake Drive to the G.A. T.R. site. The latter issue is of minor consequence in any practical sense.

The first question which involves the principal issue in the case, turns upon the legal effect to be given to the Ringwood Survey or plan which was prepared in about 1926. That was a projected scheme for the development and sale of the 1,100 acres above referred to, in convenient parcels allocated to so-called blocks. That plan was incidental to the establishment of fixed monuments for triangulation points, to form the basis of metes and bounds descriptions to be included in deeds of parcels of lands which might be conveyed to purchasers by the predecessor in title of this defendant. Certain conveyances were so made, with rights of way over roads which were suggested on that plan.

The survey was never filed as a map in any public office, and hence there was no dedication of roads whereby the rights of the public to their use was ever established. Since that is true of the roadways shown on the survey, it follows that the blocks and lot lines also shown were tentative only, and could be altered, modified or abolished by the owner of the acreage, so long as the legal rights of access on the part of the few grantees named in deed from the owner, were recognized and protected.

Since some thirty-three years elapsed between the preparation of the Ringwood Survey and the taking of these properties, it must be evident that the election not to file the survey as an official map was deliberate and calculated. The defendant has shown conclusively that the filing of such a map and the dedication of roads so indicated, would have involved an expense in maintenance and perhaps of construction, that evidently was not deemed to be justified, in view of the nature and character of the property. The few sales that have taken place in this area, are consistent with that attitude of mind.

There is another possible reason, as suggested by the witness Ackerson, namely that the tax assessors have been known to employ a lower rate of assessment on acreage, than on building lots or sites shown upon a filed map.

Reverting to the clear right of the defendant to alter, modify or change the allocation of blocks and lots shown on the Ringwood Survey, the opinion testimony of the Government's witness Smith that such right was retained, remains uncontradicted; nor is it understood that the defendant's witness Ackerson takes issue on this point. He has based his opinion concerning values and damages on the tentative block and lot lines of Ringwood, which seemingly he accepts in the practical sense, as indicating the best scheme of development that can apply to the property taken, and that which lies adjacent to it, without attributing legal significance to the survey.

The Court is not at liberty to disregard the fact that the block and lot lines so shown are at best tentative until the defendant chooses otherwise. Nor is the Court permitted to conjecture whether the defendant is likely to change its corporate mind as to the best and most appropriate use to which the property not taken, can be put.

To reason otherwise would be to conclude that the promulgation of the Ringwood plan in 1926 tied the hands of the Government to block 533 and the division thereof into building sites as of August 17, 1959 when it condemned the property in the effort to adopt protective measures in the national interest, while the owner was free to disregard that block and all other property lay-outs in the exercise of its unfettered preferences. To that position this Court cannot subscribe.

The case of Hazard Lewis Farms v. State of N. Y., 1 A.D.2d 923, 149 N.Y.S. 2d 658, cited by the defendant, has been examined and is thought not to be opposed to the views of this Court; the award in that case was based upon acreage valuation and that Court said that the property taken was available for commercial and residential development, and the fact that it had never been subdivided into building lots in accordance with a map filed for that purpose, was not dispositive of the controversy. The opinion contains the following (149 N.Y.S.2d at page 661):

"* * * In such a situation a distinction between raw acreage and a subdivision value should not be too tightly drawn. The end rule in every condemnation proceeding is that an owner is entitled to receive the fair market value of property taken from him based on the most advantageous use to which it can be put. [Citing cases.] All other rules that tend to prevent an inflationary build-up of value where no apparent potential exists must be considered as subordinate to this end rule, and to be applied only in an appropriate situation. Every claim

must necessarily be determined upon its own peculiar facts, but since the condemner has the advantage of striking when it chooses it would be obviously unfair to deprive an owner of any element of potential value simply because he has failed to file a map."

The foregoing obervation must be read in connection with the facts presented in that case which are quite dissimilar to those here involved. It is a far cry from that decision to assert that a given block shown on a tentative plan, must be deemed to have established its existence for the purpose of awarding indirect damages to property not actually taken.

This Court finds as a fact that the subject matters of this proceeding—fee and easements—constitute acreage and are part of the total estimated at about 1,100 acres; it is concluded as a matter of law that the damages are to be computed on the basis so found.

### Damages
### As to the 6.65 acres constituting Damage Parcel 100

This property (Zone B—residential, 15,000 square feet minimum) was at the date of taking, an interior parcel of land having no public road frontage, distant about 1,800 feet from East Lake Drive on the West and about 1,700 feet on the North from that same road as it wound generally Southeasterly along the Southerly part of this acreage. Access was soon thereafter to be accomplished by the building of a 60 foot road from East Lake Drive at a point about South of this damage parcel, which road winds generally to the North in conformity to the terrain, to give access to the site. On the project map, U. S. Exhibit 1, this is shown as 101–E, not a damage parcel in this proceeding. As to it, the Government has acquired an easement, and the damage parcels 100E–1 and 100E–2 are the respective five foot strips lying on either side, and involve together .49 of an acre.

While the statement is true that this was an interior parcel so far as public road frontage is concerned, it is also true that it could be reached over a two rut dirt road, that led at an undisclosed point from East Lake Drive in a winding Easterly course that conformed to the undulations of the terrain; it merged into or formed part of a similar road that wound its way generally around the lower level of the hill or knoll on the top level of which the said damage parcel was laid out. The testimony is that part of that primitive road was observable in photos taken from the air which are in evidence; also that parts were overgrown with grass, so that it cannot be described as a continuous circular road around this hill, at the date of taking. Thus the indication or suggestion of such a road on the Ringwood Survey is thought to indicate that such a partially used and somewhat observable road was indicated on the survey by way of recognition, but not that it was laid out and brought into even primitive being as the result of the making of the survey. The plan suggested by that study probably took advantage of the natural contours of the acreage.

The importance of access by road to this property is too obvious to require comment, and explains why the Government at once acquired an easement in the 60 foot roadway leading to the site, from East Lake Drive, and proceeded to build a substantial road capable of sustaining modern traffic as so required. That is shown on the Project Map, Exhibit 1, as damage parcel 101–E (not here involved). On each side there is a five foot strip above referred to as being damage parcels 100E–1 and 100E–2 concerning which easements have been taken.

For present purposes then, damage parcel 100 as of the date of taking had no public road frontage; and access by the two rut road which has been described was of so uncertain and questionable a character that the remoteness of the site for residential purposes probably explains why no private purchaser saw fit to acquire it.

The sales to Weismantel and Star are the principal ones relied on to establish

the fair and reasonable value of the acreage taken in damage parcel 100. This is true as to both experts.

As to the former, the first was in 1951, 3.5 acres, $1,142 per acre. The second was in 1957, 10.238 acres indicated (Rev. stamp) consideration $900 per acre, actual $496 per acre.

As to Star, his first purchase on October 31, 1957 was of 2.3 acres at $2,800 or of 2.8 acres, which would be computed at $2,321 per acre, mostly comparatively high land. Star's second purchase was in November 1958 and comprised .828 acres abutting on the property first so acquired, consideration $4,830 per acre. It seems to be conceded by defendant's expert that this property had a special value to the purchaser to round out his earlier acquisition and the price paid must be so understood.

Also, the Weismantel and Star properties enjoyed road frontage to connect them with East Lake Drive, namely a Government installed road, erected to provide access to a World War II facility lying to the East of present damage parcel 100.

As to the first Weismantel purchase, there were certain buildings which had been erected by the Government, and converted into use by the purchaser. Thus the property was not just unimproved acreage.

Another sale relied upon by defendant is by this defendant to Sea Scape Realty Co., February 19, 1959, 10.489 acres about 2,000 feet West of damage parcel 100, at $2,000 per acre, having road frontage. This means that it fronted for 1,000 feet on East Lake Drive, a 60 foot public highway maintained by the Town of East Hampton (See U. S. Exhibit 17). This sale is not helpful for present purposes.

### Sales relied upon after the Taking

In deference to the decision in United States v. 63.04 Acres, etc., 2 Cir., 245 F.2d 140, et seq., evidence was received of one or more sales that were negotiated and concluded after the date of his taking. It is not understood that the Court in that case went so far as to decide what such sales must be deemed to have demonstrated to the trier of the facts concerning fair market value as at the critical date.

The Government argues that such sales may be freely consulted for the purpose of ascertaining whether indirect damage has been suffered by property not actually taken, and that is thought to be a sensible and pragmatic view.

Such sales are:

June 17, 1960—(ten months after the taking) Weismantel to Bernagozzi, 4.216 acres at $2,400 per acre, if the acreage was 4.216 instead of 5.

This property had at that time a frontage of 125 feet on the newly constructed access road above referred to. In that respect the property conveyed was no longer an interior plot.

Nov. 5, 1960 —Weismantel to Scofield, 2.8 acres at $3,215. per acre, accessible by hard surface road that also serves the Star and Weismantel properties. In point of access the contrast with damage parcel 100 as of the date of taking is obvious.

The post-taking sales are therefore of no help in establishing the probable market value of the piece of property on August 17, 1959. The paucity of sales within a reasonable time before that date is to be accounted for by its remote situation, and the limited demand for residential purposes in the immediate area. The Star and Weismantel transactions form the best available criteria for present purposes, and the divergent opinions of the expert witnesses, both of whom are men of demonstrated capacity and convincing demeanor on the witness stand, was expectable and helpful to the

Court. A study of their testimony leads to the conclusion that neither opinion can be fully adopted. As the result of viewing the property after the testimony had been closed, this Court is persuaded that damage parcel 100 cannot be thought of as less than the most attractive portion of the knoll unofficially known as Prospect Hill. As a site for a residence it commands a beautiful marine vista in all directions and probably would have been so recognized by a discriminating buyer had it been truly accessible by an adequate paved roadway, leading to or from East Lake Drive.

That it was entitled to a higher probable market value than the lower aspects of the rise and adjacent lands, impels this Court to differ with Mr. Smith on this subject. In my opinion the fair and reasonable value, compared to the prices paid in the sales which have been studied, was $2,500 per acre, or $16,625, and it is so found.

### Indirect Damages

(a) Severance damages as claimed. This item according to the Ackerson testimony is $14,875.

The theory is that Block 533 as shown upon the Ringwood Survey should be regarded as a unit from which damage parcel 100 has been severed. That theory is plausible but not persuasive. For reasons heretofore stated, the Ringwood Survey is not deemed to be legally sufficient to sustain the theory; this means that the damage parcel has not been severed from the theoretical block 533, but is acreage which has been taken from a tract estimated to be of about 1,100 acres in extent. What has not been taken in the immediately adjacent area has not been diminished in value by the taking, in the opinion of this Court. The defendant could have sold this damage parcel for residential purposes had there been a purchaser, and the price per acre would have depended on how much property was desired. In fixing a price, both buyer and seller would have been aware of the difference in value between the upper and lower aspects of the knoll, and their minds would have met with that understanding.

It is found and concluded that no severance damage has been demonstrated by the testimony.

(b) Consequential damages as claimed.

Under this heading the defendant asserts damages in the sum of $10,000, namely an alleged diminution in value of adjacent property by reason of the installation itself. The elements thereof are the presence of the fence surrounding damage parcel 100; the presence of the poles above described; the exterior lights of the buildings; noise from the diesel engines that actuate the generator; and in general the character and size of the installation.

It is to be remembered that this property zoned residential B, was fairly remote, and an interior parcel of land, in an area in which there had been only two sales for residential purposes, since 1951. Therefore the lessening in value of adjacent acreage for such a purpose is of a purely prophetic character. The post taking sales above referred to by Weismantel to Bernagozzi and Scofield, four and eight months respectively after the actual construction had begun (February, 1960) were for prices of $2,400 and $3,215 per acre with modern and adequate road frontage then in process and connected with the road described as 101–E, not here involved. Those properties are respectively about 300 and 600 feet Southwest of the area taken, and the increased prices paid are incompatible with a diminution in value as the result of the clearly anticipated presence of the G.A.T.R. installation.

As has been said, no one criticizes the buildings as such, but the incidental physical aspects are urged as being unsightly and injurious to the adjacent acreage so as adversely to affect its market value for residential purposes.

It would be idle to argue that the poles and the fence are ornamental or pleasing to the eye. In a settled area, they might well be described as unsightly and tend-

ing to mar the landscape. No one would choose to have them erected for artistic purposes (even in deference to certain specimens of modern architecture) but the impact of their totality is not thought to be sufficient to destroy the views of the waters that lie at some distance from them, on the part of property owners who may become such in the course of time. The task of assigning a dollar value to the suggested diminution in market value in the adjacent area, by reason of the presence of the poles and the fence, has eluded the capacity of this Court, in spite of the testimony offered by the witness Ackerson (which is lacking in factual data), and the earnest advocacy presented for the defendant.

As to the lighting, it consists of flood lights facing the buildings and illuminating a strip around them for the detection of the presence of unauthorized persons at night. Naturally that zone is visible as would be a garage having ornamental lighting appurtenant to a private residence if one were there, but to argue that it depreciates the market value of adjacent acreage for residential use, is less than convincing.

The noise made by the diesel engine can be heard at a distance of about 40 feet from the building, depending on the direction of the wind at a given time. While obviously it does not add to the market value of adjacent acreage, there is no support in the testimony for the assertion that it detracts therefrom.

In view of the high level at which the facility functions, it may be doubted if an adjoining owner at a lower level would be aware of the operation of the engine. Such was the impression that I gained upon inspection of the entire site.

The entire character of the installation creates no detriment to the market value of adjacent acreage. There are no military or other personnel housed on the property, and but two or three men are in attendance during operating hours. The hazards attending such installations as the Nike and the Bomarc sites are entirely absent.

Moreover the benefits conferred upon the acreage adjoining damage parcel 100, by the building and maintenance of the 60 foot road leading from East Lake Drive to the site, were estimated by defendant's witness Ackerson to be worth perhaps $20,000 to $30,000 to the area in general. If that figure is realistic, the argument for consequential damage is more than refuted.

It is found and concluded that the testimony does not support the defendant's claim for consequential damage.

### The Easements, Tracts 100E–1 and 100E–2

These are two five foot strips at the sides of what has been referred to as 101–E (not in this proceeding), the road leading to damage parcel 100 from East Lake Drive.

The legal description is as follows:

"A perpetual and assignable easement and right-of-way to locate, construct, operate, maintain, repair, patrol and/or remove all utilities including but not limited to power lines, telephone and electric lines and cables, water lines, gas lines, sewer lines and drainage lines in, upon, over and across Tracts Nos. 100E–1 and 100E–2, together with the right to trim, cut, fell, and remove therefrom all trees, underbrush, obstructions, and any other vegetation, structures, or obstacles within the limits of the right-of-way; subject, however, to existing easements for public roads and highways, public utilities, railroad and pipelines, reserving, however, to the landowner, its successors and assigns all right, title, interest and privilege as may be exercised and enjoyed without interference with or abridgment of the easement and rights hereby taken for said public uses."

The concluding words indicate the character of the servient tenement. The Court sought in vain for information as to what practical use remained to the defendant, i. e., what the latter could do by way of exercise of "interest and privi-

lege" in view of the comprehensive scope of the easement. To this Court it is clear that there is no difference except in legal theory, between a taking in fee, and the establishment of these easements, and the award of damages will not seek to establish so artificial a distinction. Because the road itself (Tract 101–E) resides in an easement, it was logical enough to follow that pattern as to these strips, without affecting the practical issue of damages.

As to assigning a fair and reasonable market value to these strips in view of the acreage involved (.49) running for the entire length of the new road (about 2,000 feet), it seems obvious that the acreage value attributed to high level damage parcel 100, cannot be thought to apply.

While the witness Ackerson called his figures "nuisance value" plus cost of re-engineering adjoining land (not support-ed by testimony) for a total of $1,500, the witness Smith suggests 40% of his basic acreage value of $1,500, or $294 representing .49 of an acre.

It seems to this Court that the value of the acreage so embraced is not to exceed 60% of the acreage value of damage parcel 100 by reason of the winding course of these two narrow strips, and their location for the most part well below the upper level of the site. As has been said, the taking is deemed to be complete; the value of the land so taken after the imposition of the easement is deemed to be nothing in any practical sense. Therefore the value of the easement is fixed at .49 of $1,500, or $735.

The award to defendant is therefore $16,625 plus $735, or $17,360, in all.

The Court is indebted to both counsel for skilful and helpful advocacy.

Settle decree.